UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-23952-CV-WILLIAMS
MAGISTRATE JUDGE REID

JIMMIE L. BOWEN,

      Petitioner,

v.

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,

      Respondent.
_____/

## REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

### I. Introduction

This matter is before the Court on Petitioner's Amended Petition for Writ of Habeas Corpus, filed with the assistance of counsel, and brought pursuant to 28 U.S.C. § 2254. [ECF No. 6]. Petitioner **Jimmie L. Bowen** challenges his conviction following a jury trial in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, **Case No. F08-46866B**.

Pursuant to the Rules Governing Section 2254 Proceedings, the Court "must promptly examine" the Petition upon receipt from the Clerk of Court. Rules Governing Section 2254 Proceedings, R. 4. Accordingly, this matter has been referred to the Undersigned for Report and Recommendation on any dispositive

matter pursuant to 28 U.S.C. § 636(b)(1)(B) and S.D. Fla. Admin. Order 2019-2. [ECF No. 2].

Petitioner asserts one overarching claim in his Amended Petition: the placing of Petitioner in a wired police station interview room with his co-defendant after Petitioner had invoked his rights, and the surreptitious recording of their conversation, violated *Miranda v. Arizona*, 384 U.S. 436 (1966), Florida and federal guarantees of Due Process, and the Florida Wiretap Statute, and it was reversible error to deny his motion to suppress. [ECF No. 6 at 15].

Upon the Undersigned's review of the record in this federal habeas case and the underlying state court criminal case, the state court's determination that Petitioner's incriminating statement was not acquired in violation of his Fifth Amendment rights was an unreasonable application of clearly established federal law. Accordingly, as further discussed below, the Undersigned **RECOMMENDS** the Amended Petition [ECF No. 6] be **GRANTED IN PART** as to his Fifth Amendment claim and **DENIED** in all other respects.

## II.     Factual and Procedural History

On December 13, 2008, Pierre Roche and a ten-month-old infant were shot and killed during a dominoes game outside a grocery store near 58th Street and 22nd Avenue in Miami, Florida. [ECF No. 6 at 2]. Another man sitting with them, Christopher Smith, was also shot, but survived. [*Id.*].

2

Also present was Derrick Days Sr., the father of the ten-month-old infant who was killed. [*Id*.]. Days could not identify the shooter but described the shooter's weapon as a black and chrome semi-automatic pistol and stated that more than five shots were fired. [ECF No. 12 at 15]. Days also stated that the shooter was a black male, a little taller than he was (5'7"), and had a white flag or bandana covering his face. [*Id*.]. According to Days, the shooter "emptied his clip" and shot Mr. Roche twice, once while he was laying on the ground. [*Id*.].

Another man, Milliage Chester, did not witness the shooting itself but did see what he believed to be the suspect walking in the area nearby before the shooting. [ECF No. 14-5 at 37-38]. Chester stated that the suspect was not wearing a face covering before the shooting, but he did not recognize him and could not identify him at trial. [*Id*. at 42]. Like Days, Chester identified the suspect as a black male who was approximately 5'8". [*Id*.]. After hearing several gunshots, he saw the person he believed to be the suspect run towards a white truck and leave the scene at a high rate of speed. [*Id*. at 38-41].

Immediately after the shooting, Detective Solis, the lead investigator, testified that the police "had no leads whatsoever." [*Id*. at 130]. No one was able to identify the shooter, except describing him as an average height black male. [*Id*.]. There was no DNA or other physical evidence recovered from the scene of the shooting except for nine bullet casings, a shoe print potentially from the shooter, and vehicle tread

3

prints, potentially from a get-away vehicle. [*Id*.]. However, with no firearm, suspect, or vehicle, there was nothing to compare. [*Id*.].

On December 18, 2008, Detective Solis's luck changed. Out of nowhere, Terrence "Bull" Yarborough, a four-time convicted felon, identified Petitioner as the shooter to Detective Solis following Yarborough's arrest for an unrelated armed robbery in which Yarborough potentially faced life imprisonment if convicted. [ECF No. 6 at 6, 12-13]. Later that same day, Petitioner, who was sixteen years old and only had a ninth-grade education, was arrested at his home and brought to the police station. [*Id*. at 12-13]. Less than an hour later, two detectives entered Petitioner's interrogation room with Petitioner's mother and read Petitioner his *Miranda* rights. [*Id*. at 3]. Petitioner was advised by his mother to invoke his *Miranda* rights, and Petitioner did so in writing. [*Id*.].

The detectives subsequently left Petitioner's interrogation room and did not continue questioning him. [*Id*.]. Petitioner's mother then told the detectives that she wanted to be present if they were going to interrogate her son, and to otherwise leave him alone. [*Id*.]. Petitioner's mother then left the police station. [*Id*.].

Petitioner's co-defendant, Bernard Jones, however, did waive his rights and spoke with Detective Solis about the incident, but it is unclear exactly what was discussed. [ECF No. 13-3 at 19]. During Detective Solis's conversation with Jones, Detective Solis observed that Petitioner attempted to call Jones using his cellular

telephone, though it does not appear that Jones answered. [ECF No. 14-5 at 97]. Soon after their conversation, Detective Solis brought Petitioner into Jones's interrogation room, and secretly turned on a recording device. [*Id.*].

Detective Solis originally testified at the suppression hearing that this was for purposes of facilitating the transfer of Petitioner and Jones to a Juvenile Assessment Center, however Petitioner argued that Detective Solis's reasoning was pretextual and that Detective Solis was secretly recording them in the hopes that they would make incriminating statements. [ECF No. 6 at 3]. On cross examination, Detective Solis later testified after being impeached with prior deposition testimony that he did in fact place Petitioner with Jones "to see if they were going to talk about the investigation." [ECF No. 14-1 at 27-31]. When Detective Solis was further asked: "You put them together, you wanted to see if they would talk about this case?" he answered: "Correct." [*Id.* at 31]. On redirect examination, when Detective Solis was asked if he knew they were going to talk about the case, he said: "Correct. Possibly." [*Id.* at 32]. When asked if "as investigator [he] hoped that obviously they'll talk about the case," Detective Solis said that "[a]bsolutely" he hoped so. [*Id.*].

Unsurprisingly, Petitioner did make several incriminating statements to Jones, though the vast majority of the conversation was initiated by Jones. [ECF No. 13-2 at 22-41]. When talking with Jones, Petitioner seemingly acknowledged to him that Petitioner was the shooter and Jones was the driver; described the scene of the crime,

for example, that the people present at the shooting were sitting at a dominoes table and had their backs to the shooting; and incredulously wondered "how the f***" the police had "the two right motherf***ers" because Petitioner and Jones were the only two living people who "know the truth." [*Id.*]. Clearly, Petitioner was unaware that Jones had waived his *Miranda* rights and had spoken with Detective Solis, because Jones denied talking with Detective Solis about the case. [*Id.*]. Petitioner was also seemingly unaware that Detective Solis knew that Petitioner had tried to call Jones from his interview room.

On the other hand, Detective Solis testified that at no time did anyone say or promise anything to Petitioner to elicit a statement from him, nor did anyone ask Petitioner's co-defendant Jones to speak with Petitioner or promise anything to Jones to elicit a statement from Petitioner. [ECF No. 14-1 at 32-33]. Further, Detective Solis stated that Petitioner and Jones did not ask to have a private conversation or ask for a private room, and all that he told them was that they were going to wait together in the room to be transported to the Juvenile Assessment Center, though it turns out that they were not actually transported together, and that Petitioner was transported several hours after Jones.[*Id.* at 32-33, 76-77].

Petitioner also made unchallenged incriminating statements on at least two other occasions in addition to the interrogation room conversation with Jones. After being transported, Petitioner made several recorded jailhouse telephone calls further

implicating himself and discussing his belief that Mr. Yarborough "snitched" on Petitioner and Jones. [ECF No. 13-2 at 72-76]. Petitioner was correct; as stated before, Mr. Yarborough had implicated Petitioner to investigators and recounted to investigators conversations between him and Petitioner made before and after the shooting. [ECF No. 6 at 6, 12-13]. Mr. Yarborough provided his telephone records corroborating his statement that after the shooting, Petitioner called him, and they allegedly discussed the incident. [*Id.*].

On December 24, 2008, Petitioner was charged with two counts of First-Degree Murder for the deaths of Pierre Roche and the ten-month-old infant, two counts of Attempted Premeditated Murder, and two counts of Attempted Felony Murder. [ECF No. 13-2 at 1-11]. Petitioner moved to suppress his statements to his co-defendant Jones based on violations of his Fourth, Fifth, and Sixth Amendment rights, as well as under the Florida Constitution and Florida law [ECF No. 13-2 at 12-21], but the motion was denied, and the evidence was allowed at trial. [ECF No. 14-1 at 115-118].

Rather than issue a written opinion, the state court ruled orally from the bench. [*Id.* at 117-18]. In denying Petitioner's motion to suppress, the state trial court solely stated as follows:

> THE COURT: Okay. I want you to know that I have read all the cases. In an overabundance of caution[,] I consulted with three of my colleagues because this – I am new to this division. Okay. I consulted

7

three of my colleagues in the building and spoke to them at length just to confirm what I thought I should do and so I feel pretty confident in my ruling that I'm going to deny the motion to suppress. I'm not going to suppress the statements. Okay.

…..

THE COURT: I don't know if I have to [issue a written ruling]. We had a lengthy hearing, everybody testified. I read the cases. I read [*State v.*] *Calhoun*[, 479 So. 2d 241 (Fla. 4th DCA 1985)]. I read the Third District Court of Appeals cases and what the distinction in *Calhoun* is, and, I think this is a very important distinction, is that the defendant asked for privacy and said, can I have privacy with my brother. It was a relative that was the co-defendant. And the Court made a very important distinction, that didn't happen here. And I listened to the testimony of Mr. Bowen's mother and I understand the Right had been – he signed the *Miranda* Warnings and invoked his right to remain silent, but I think that – I don't think it's a statement that should be suppressed at this time.

[ECF No. 14-1 at 117-18].

Petitioner was tried by a jury and renewed his objection to the evidence being admitted on Fourth, Fifth, and Sixth Amendment grounds, but was denied without explanation. [ECF No. 14-8 at 94-95]. On August 1, 2012, following the jury trial, Petitioner was found guilty of two counts of First-Degree Murder and two counts of Attempted Premediated Murder. [ECF No. 13-2 at 77-86].

On September 18, 2013, Petitioner was sentenced to life in prison without parole. [*Id*. at 92-95]. After filing a motion to correct his sentence, on June 8, 2015, Petitioner received a new sentence of life imprisonment with a judicial review after

twenty-five years, subject to a twenty-five-year mandatory minimum sentence, to run consecutively with another sentence. [*Id*. at 96-98].

Petitioner appealed, arguing among other things, that the trial court erred in denying his motion to suppress. [ECF No. 13-3 at 1-55]. Petitioner's appeal was denied, *per curiam*, and without a written opinion on February 3, 2016. [*Id*. at 99]; *see also Bowen v. State*, 184 So. 3d 533 (Fla. 3d DCA 2016). Petitioner's motion for rehearing *en banc* of the denial was denied on April 14, 2016, [ECF No. 13-3 at 106], and his conviction became final 90 days later, on July 12, 2016. *See* 28 U.S.C. § 2244(d)(1)(A). Petitioner then filed several other post-conviction motions not relevant here, all of which were denied.

Petitioner filed his original *pro se* Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in this Court on August 18, 2019. [ECF No. 1]. Petitioner retained counsel and filed the instant Amended Petition on November 11, 2019. [ECF No. 6]. The Amended Petition raised one claim: that the placing of Petitioner in Jones' interview room after he invoked his *Miranda* rights and secretly recording them violated *Miranda*, Florida and federal guarantees of Due Process, and the Florida Wiretap Statute, and it was reversable error to deny his motion to suppress. [*Id*. at 15].

Respondent filed a Response in opposition to the Amended Petition on January 8, 2020. [ECF No. 12]. In the Response, Respondents concede that this case

9

was timely filed and properly exhausted but argue that Petitioner's claim should nevertheless still be denied on the merits. [*Id.*]. Petitioner filed his Reply on January 27, 2020 [ECF No. 17], and this case is now ripe for review.

### III.    Discussion

A.    <u>Standard of Review</u>

This Court may only entertain a petition for a writ of habeas corpus from a "person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Thus, as a threshold matter, Petitioner's claims alleging violations of the Florida Constitution and of Florida law should be denied because they do not allege a violation of the U.S. Constitution or federal law. *See id.*; *see also Carrizales v. Wainwright*, 699 F.2d 1053, 1055 (11th Cir. 1983).

Further, a federal habeas petition may not be granted unless "the applicant has exhausted the remedies available" in state court prior to filing the federal habeas petition. 28 U.S.C. § 2254(b). Even so, "the availability of federal habeas relief is limited with respect to claims previously 'adjudicated on the merits' in state-court proceedings." *Harrington v. Richter*, 562 U.S. 86, 91 (2011). "By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (2)." *Id*. at 98.

10

In Petitioner's state court case, before trial, Petitioner's attorney filed a motion to suppress his interrogation room statements to his co-defendant Jones. [ECF No. 13-2 at 12-21]. The motion argued that the statements should be suppressed because they were acquired by police in violation of Petitioner's Fourth, Fifth, and Sixth Amendment rights, as well as in violation of Petitioner's rights under the Florida Constitution and Florida law. [*Id*.]. The state court denied the motion to suppress without a written opinion and ruled orally from the bench, as recounted above. [ECF No. 14-1 at 117-18]. After trial, all of Petitioner's post-conviction appeals, including his appeal of the denial of the motion to suppress, were affirmed, *per curiam*, and without a written opinion. [ECF No. 13-3 at 99].

Accordingly, because the state appellate court was silent in affirming the denial of the motion to suppress, this Court is required to "'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale," which in this case is the trial court's oral ruling denying the motion to suppress. *Wilson v. Sellers*, 584 U.S. ___, ___, 138 S. Ct. 1188, 1192 (2018); *see also Meders v. Warden, Ga. Diagnostic Prison*, 911 F.3d 1335, 1349 (11th Cir. 2019) (citing *Wilson*, *supra*).

In looking through to the decision of the state court, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of

any indication or state-law procedural principles to the contrary." *Harrington*, 562 U.S. at 99. The presumption in *Harrington* is rebuttable, however, "only in unusual circumstances." *Johnson v. Williams*, 568 U.S. 289, 302 (2013). In Petitioner's case, the presumption applies, and neither party seeks to dispute this, because the federal claim was clearly presented to the state court, and the motion to suppress was denied on the merits, rather than a procedural rule.

As for the standard this Court reviews Petitioner's claim, Respondent argues that § 2254(d) deference to the state court's adjudication on the merits is appropriate, and Petitioner does not challenge this argument. Accordingly, under § 2254(d), the Court may grant habeas relief from the state court judgment only if the state court's decision on the merits of the federal claim was: (1) "contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented" in the state court proceeding. 28 U.S.C. § 2254(d).

"Deciding whether a state court's decision involved an unreasonable application of federal law . . . requires the federal habeas court to train its attention on the particular reasons — both legal and factual — why state courts rejected a state prisoner's federal claims, and to give appropriate deference to that decision." *Wilson*, 584 U.S. at ___, 138 S. Ct. at 1191-92 (quotation marks and citations omitted).

12

Again, this standard is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*)).

"A decision is 'contrary to' clearly established federal law if the state court applied a rule that contradicts governing Supreme Court precedent, or if it reached a different conclusion than the Supreme Court did in a case involving materially indistinguishable facts." *James v. Warden*, 957 F.3d 1184, 1190 (11th Cir. 2020) (citing *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)). "A state court decision involves an 'unreasonable application' of clearly established federal law if the court identifies the correct legal principle but applies it unreasonably to the facts before it." *Id*. (citing *Williams*, *supra*).

"The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Id*. at 1190-91 (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). "A state court's application of clearly established federal law or its determination of the facts is unreasonable only if no 'fairminded jurist' could agree with the state court's determination or conclusion." *Id*. at 1191 (quoting *McNabb v. Comm'r Alabama Dep't of Corr.*, 727 F.3d 1334, 1339 (11th Cir. 2013) (internal citations omitted).

In this case, the only state court decision that provides any rationale is the oral ruling denying the motion to suppress from the state court pre-trial proceedings. [ECF No. 14-1 at 117-118]. Admittedly, the ruling is scant; the only legal and factual reasons that the state court provided in denying the motion to suppress was that it had "read the Third District Court of Appeals cases and what the distinction in *Calhoun* is… that the defendant asked for privacy and said, can I have privacy with my brother. It was a relative that was the co-defendant. And the Court [in *Calhoun*] made a very important distinction, that didn't happen here." [ECF No. 14-1 at 118].

B.     Petitioner's Fourth Amendment Claim

First looking to Petitioner's Fourth Amendment claim, the Fourth Amendment states that, among other things, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "To assert a Fourth Amendment violation, an individual must establish he or she had a legitimate expectation of privacy in the place searched." *Ziegler v. Martin Cnty. Sch. Dist.*, 831 F.3d 1309, 1320 (11th Cir. 2016) (citing *Rakas v. Illinois*, 439 U.S. 128, 148-49 (1978); *United States v. Brazel*, 102 F.3d 1120, 1147-48 (11th Cir. 1997)). "Establishing a legitimate expectation of privacy is 'a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.''" *Id*.

14

at 1320-21 (quoting *United States v. Ford*, 34 F.3d 992, 995 (11th Cir. 1994); *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)).

In Petitioner's case, he argued in his motion to suppress, *inter alia*, that the police violated his Fourth Amendment rights when they secretly recorded his conversation with his co-defendant. The state court determined that the main case cited by Petitioner, *State v. Calhoun*, 479 So. 2d 241 (Fla. 4th DCA 1985), was factually distinguishable because the defendant in *Calhoun* asked the police for privacy. [ECF No. 14-1 at 118]. Accordingly, the court held that because Petitioner did not ask for privacy to speak with his co-defendant, his motion to suppress should be denied. [ECF No. 14-1 at 118].

While Petitioner now cites a variety of cases from various courts arguing that the state court's adjudication was incorrect, it is not enough to be merely incorrect. The state court's adjudication is entitled to substantial deference under § 2254(d), and Petitioner may only be granted relief if the decision was "unreasonable," meaning he must prove "no 'fairminded jurist' could agree with the state court's determination or conclusion." *McNabb*, 727 F.3d at 1339.

Here, Petitioner cannot meet this "substantially higher threshold." *Schriro*, 550 U.S. at 473. Petitioner was in a police interview room when he made the statements to his co-defendant. There was no Supreme Court case involving materially indistinguishable facts, and the state court's determination that Petitioner

failed to exhibit a legitimate expectation of privacy, unlike the defendant in *Calhoun*, was not unreasonable. Accordingly, Petitioner's Fourth Amendment claim should be denied.

C.     Petitioner's Fifth Amendment Claim

Next, we look to Petitioner's Fifth Amendment argument, which was not expressly discussed in the state court's oral ruling but was extensively argued and briefed by the parties in the motion to suppress and on direct appeal in state court. Since there is no requirement that a state court provide written reasons accompanying its orders, in cases like this one, where the state court's merits adjudication of a federal claim contains no explanation at all, "[u]nder § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court of the United States.]" *Harrington*, 562 U.S. at 102. To determine what arguments or theories "could have" supported the state court's denial of Petitioner's Fifth Amendment claim, the Court must first look to Petitioner's Fifth Amendment rights, and the facts of the alleged violation by the police.

"The Fifth Amendment prohibits the admission at trial of compelled testimonial self-incriminating statements - inculpatory statements made to law

16

enforcement while in custody - providing, in relevant part that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]'" *Gore v. Sec'y for the Dep't of Corr.*, 492 F.3d 1273, 1295 (11th Cir. 2007) (quoting U.S. Const. amend. V). The "threshold Fifth Amendment admissibility inquiry" is: "was the suspect given a warning advising him of the now-familiar four *Miranda* rights." *Id.* at 1295-96 (citing *Dickerson v. United States*, 530 U.S. 428, 435 (2000); *Miranda*, 384 U.S. at 479).

"If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473; *see also Gore*, 492 F.3d at 1296. Accordingly, a request to cut off questioning must be "scrupulously honored." *Michigan v. Mosley*, 423 U.S. 96, 104 (1975). "[A]n accused … having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). "[A]bsent a finding of waiver, if counsel is not present, any statement made following the request for counsel is presumed to be the result of coercion and is, therefore, inadmissible." *Gore*, 492 F.3d at 1299 (citing *Smith v. Illinois*, 469 U.S. 91, 98-99 (1984) (holding that since all statements taken after a clear request for counsel are presumed to be the product of coercion those statements may not cast doubt on the clarity of the request)).

"The sole concern of the Fifth Amendment, on which *Miranda* is based, is governmental coercion." *United States v. Phillips*, 812 F.2d 1355, 1362 (11th Cir. 1987) (quoting *Colorado v. Connelly*, 479 U.S. 157, 170 (1986)). Custodial settings are more likely to produce coerced confessions, thus necessitating *Miranda* warnings for custodial interrogations. *See generally, Thompson v. Keohane*, 516 U.S. 99, 112 (1995); *United States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004).

Here, it is not disputed that Petitioner made a clear and unequivocal invocation of his *Miranda* rights after being advised of them. It is also not disputed that Petitioner was in custody when he made his statements. Accordingly, after invoking his *Miranda* rights, the investigators were barred from engaging in any form of custodial interrogation of Petitioner without his attorney present. *See Gore*, 492 F.3d at 1299. The remedy for such a violation would typically be suppression of the statement. *See id.* (citing *Edwards*, 451 U.S. at 484-85).

In looking to what theory could have supported the state court's decision, there are only a handful of arguments the state court could have relied upon. In general, the most common arguments made by prosecutors against an alleged Fifth Amendment violation consist of: (1) waiver by the suspect; (2) the suspect not being "in custody" during the interrogation; (3) there was no "interrogation" of the in custody suspect; or (4) a factual dispute as to the circumstances of the alleged Fifth Amendment violation where the court finds in favor of the prosecution.

Here, the parties' pleadings are illuminating. Respondent argued at all stages of this case that Petitioner's statements should not be suppressed because they were freely made and not the product of a "custodial interrogation." Petitioner argues that the statements were the result of a custodial interrogation because Detective Solis' actions were the "functional equivalent" of a custodial interrogation.

The state court could not have relied upon a waiver argument because Petitioner did not waive his *Miranda* rights, he invoked them in writing. The state court could not have relied upon an argument claiming that Petitioner was not in custody at the time he made the statements, because Petitioner was in fact in custody. Because there was no factual dispute as to what took place, the only remaining argument the state court could have relied upon in denying the motion to suppress was the argument actually made by Respondent and squarely before the state court, namely that Detective Solis's actions were not the functional equivalent of a custodial interrogation.

"[C]ustodial interrogation" means "questioning *initiated* by law enforcement officers after a person has been taken into custody." *Rhode Island v. Innis*, 446 U.S. 291, 298 (1980) (quoting *Miranda*, 384 U.S. at 444) (emphasis in original). However, Supreme Court precedent clearly holds that "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to *any words or actions* on the part of the police … that the police *should know are reasonably likely*

19

*to elicit an incriminating response* from the suspect." *Id*. at 301 (emphasis added). Further, the Supreme Court held, "the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning *or its functional equivalent*." *Id*. at 300-01 (emphasis added). On the other hand, "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected." *Id*. at 300 (quoting *Miranda*, 384 U.S. at 478).

"Any knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response from the suspect." *Id*. at 302, n.8. "Thus, custodial interrogation for purposes of *Miranda* includes both express questioning, and also words or actions that, given the officer's knowledge of any special susceptibilities of the suspect, the officer knows or reasonably should know are likely to 'have . . . the force of a question on the accused,' … and therefore be reasonably likely to elicit an incriminating response." *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (internal citations omitted).

To show a *Miranda* violation, Petitioner "must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986). The "primary concern" is the use of "secret interrogation techniques that are

the equivalent of direct police interrogation." *Id*. (citations omitted); *see also Maine v. Moulton*, 474 U.S. 159, 176 (1985).

As previously stated, because the state court was silent on why it denied Petitioner's Fifth Amendment claim, we must ask "what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court of the United States]." *Harrington*, 562 U.S. at 102. Because the parties agree in all other respects, the only argument the state court "could have" relied upon in denying the motion to suppress was Respondent's argument that Detective Solis's actions were not the functional equivalent of a custodial interrogation. In analyzing this argument, we must assume that "the court identifie[d] the correct legal principle," or in this case, principles, as discussed above and recounted below. *James*, 957 F.3d at 1190 (citations omitted).

Pursuant to the Fifth Amendment, no person shall be compelled to be a witness against themselves in a criminal case. U.S. Const. amend. V. The concern of the Fifth Amendment, on which *Miranda* is based, is governmental coercion. *See Connelly*, 479 U.S. at 170. Custodial settings are more likely to produce coerced confessions, thus necessitating *Miranda* warnings for custodial interrogations. *See Keohane*, 516 U.S. at 112. "That risk is all the more troubling—and recent studies

suggest, all the more acute—when the subject of custodial interrogation is a juvenile." *J. D. B. v. North Carolina*, 564 U.S. 261, 269 (2011) (citations omitted).

"If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473. A request to cut off questioning must be "scrupulously honored." *Mosley*, 423 U.S. at 104. "[A]n accused … having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him." *Edwards*, 451 U.S. at 484-85. Absent a finding of waiver, if counsel is not present, any statement made following the request for counsel is presumed to be the result of coercion and is, therefore, inadmissible. *See Smith*, 469 U.S. at 98-99.

To show a *Miranda* violation, Petitioner "must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Kuhlmann*, 477 U.S. at 459. The "primary concern" is the use of "secret interrogation techniques that are the equivalent of direct police interrogation." *Id.* (citations omitted); *see also Moulton*, 474 U.S. at 176.

In addition to identifying the correct legal principles above, however, the state court must also apply the facts of the case at hand, and an "unreasonable" application may result in a grant of habeas relief from the state court judgment. *See James*, 957

22

F.3d at 1190-91 (citations omitted). To analyze if the state court decision was "unreasonable" requires that the Court determine if "any fairminded jurist could disagree" that it is inconsistent with the holding of a prior Supreme Court decision. *Harrington*, 562 U.S. at 102. To obtain relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103.

In the case at hand, the facts are uncontested. Petitioner was only sixteen years old at the time he was arrested, which presents an "acute" risk of coercion pursuant to the Supreme Court's holding in *J. D. B*., 564 U.S. at 269. Further in support of this, when Detective Solis questioned Petitioner about the incident, Petitioner was accompanied by his mother, who only left after Detective Solis told her that he was being brought to the juvenile detention center. Petitioner's education level is also relevant, and it is undisputed that Petitioner dropped out of high school after the ninth grade. [ECF No. 14-1 at 60].

Next, the parties agree that when Detective Solis informed Petitioner of his *Miranda* rights, Petitioner immediately invoked them, and Detective Solis stopped the interview and left the room, as required by *Mosley*.

Police also arrested Petitioner's co-defendant, who was also a minor. Unlike Petitioner, his co-defendant waived his *Miranda* rights and provided a statement.

Petitioner did not know his co-defendant had waived his *Miranda* rights, but obviously Detective Solis did because he was present for the interview with Petitioner's co-defendant. In addition, when Petitioner was alone in his interrogation room, he used his cell phone to attempt to call his co-defendant to speak with him. Detective Solis knew that Petitioner had sought to speak with his co-defendant because he saw the caller identification on the phone indicate it was Petitioner who was calling. Pursuant to the Supreme Court's holding in *Innis*, 446 U.S. at 302, n.8, Detective Solis's knowledge "concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response from the suspect."

Knowing that Petitioner had invoked his *Miranda* rights and that he could no longer interrogate him, Detective Solis returned to Petitioner's interview room and told Petitioner that he was moving him to his co-defendant's interview room to facilitate their transport to the juvenile detention facility. At the suppression hearing, however, Detective Solis testified that Petitioner was actually moved to be with his co-defendant for what appeared to be investigative purposes. Detective Solis wanted "to see if they were going to talk about the investigation," and testified that he knew it was possible that they would speak about the case, and that he "absolutely" hoped they did. [ECF No. 14-1 at 32]. This is crucial because under *Innis*, 446 U.S. at 301,

n.7, the intent of police "may well have bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response."

Finally, after placing Petitioner in his co-defendant's interview room, Detective Solis activated a recording device without their knowledge. Again, the purpose of this was to secretly listen to Petitioner and his co-defendant "to see if they were going to talk about the investigation." Detective Solis was correct, and Petitioner did talk about the investigation with his co-defendant. This exact scenario was discussed in *Innis*, where the Supreme Court stated that: "[i]n particular, where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect." *Innis*, 446 U.S. at 301, n.7.

On these facts, the state court's denial of the motion to suppress was an unreasonable application of clearly established federal law as determined by the Supreme Court. In *Innis*, the Supreme Court held that "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police … that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301. Here, Detective Solis admitted at the suppression hearing that he essentially devised a scheme that was designed to frustrate Petitioner's invocation of his *Miranda* rights, and that the

25

scheme was successful. Petitioner moved to suppress the statements, but the state court denied the claim without even acknowledging any of the relevant Supreme Court precedent, which we provide here and assume the state court considered.

The parties do not dispute that Petitioner was in custody and had invoked his *Miranda* rights at the time of the incident. Rather, Respondent argues that Petitioner's statement was not a result of a "custodial interrogation," while Petitioner argues that Detective Solis's actions were the "functional equivalent" of a custodial interrogation because he "should have known it was reasonably likely to elicit an incriminating response" from Petitioner. Thus, the only way the state court "could have" denied the motion to suppress was to find that Detective Solis should not have known that his actions were reasonably likely to elicit an incriminating response. Such a finding is patently unreasonable given the facts known at the time.

Detective Solis obviously should have known it was reasonably likely putting Petitioner in the interview room with his co-defendant and secretly turning on a recording device would elicit an incriminating response. Detective Solis knew that Petitioner wanted to speak with his co-defendant (presumably about the case) because he witnessed Petitioner's attempt to call his co-defendant while interviewing the co-defendant. Detective Solis knew he could not question Petitioner, but he thought that if he put Petitioner together with his co-defendant, they would talk about the investigation. Detective Solis testified that he knew it was possible that they

would speak about the case, and that in his role as an investigator, he hoped they would. Thus, Detective Solis admittedly created a pretextual scheme to put them together because he "wanted to see if they were going to talk about the investigation." We know this is what happened because Detective Solis testified about this at the suppression hearing.

We also know that Petitioner was only sixteen years old, only had a ninth-grade education, was previously accompanied by his mother, and had invoked his *Miranda* rights. Yet, despite all of this, the state court ignored clear Supreme Court precedent and held that Detective Solis should not have known that his actions were reasonably likely to elicit an incriminating response. This is an unreasonable application of longstanding Supreme Court precedent starting with *Miranda* and *Innis*, and continuing with *J. D. B.*, *Mosely*, *Kuhlmann*, *Smith*, and *Moulton*, and no fairminded jurist could disagree that, on these facts, the motion to suppress should have been granted. As discussed, the only dispute was whether Petitioner's statement was the result of the functional equivalent of a custodial interrogation, and Supreme Court precedent dictates that the only reasonable answer is in the affirmative because Detective Solis obviously should have known that his scheme might be successful.

The cases cited by Respondent to argue otherwise are significantly distinguishable and inapplicable in this case. First, the case most heavily relied upon,

*United States v. Stubbs*, 944 F.2d 828 (11th Cir. 1991), dealt with a defendant who made inculpatory statements to her cellmate while in prison.

This is a fatal distinction that renders *Stubbs* inapplicable to Petitioner's motion to suppress because the Supreme Court has long stated that "[c]onversations between suspects and undercover agents do not implicate the concerns underlying Miranda" because "[t]he essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate." *Illinois v. Perkins*, 496 U.S. 292, 296 (1990) ("In the instant case no charges had been filed on the subject of the interrogation, and our Sixth Amendment precedents are not applicable.").

Respondent also admits that the only case cited by the state court, *Calhoun*, 479 So. 2d at 241, is "not relevant" because it "never acknowledges or discusses the line of cases emanating from *Rhode Island v. Innis* and the critical concept of 'custodial interrogation,'" nor does it "acknowledge or address the line of Supreme Court cases related to the [Sixth Amendment]." [ECF No. 12 at 36-37].

The Undersigned agrees that *Calhoun* is not relevant and fails to address the relevant Supreme Court precedent. Respondent's own words best reflect this: "[i]n short, *Calhoun* is utterly irrelevant to the issue of whether the state court adjudication of the instant case is contrary to or an unreasonable application of clearly established

federal law." [*Id.*]. However, the implication brought about by this bolsters Petitioner's argument, not Respondent's.

Second, Respondent's argument here also undermines its reliance on *Stubbs*, because, as Respondent argues, *Calhoun* failed to "acknowledge or address the line of Supreme Court cases related to the [Sixth Amendment]" "all of which are critical and carefully considered by the Eleventh Circuit in *Stubbs*" [ECF No. 12 at 36-37], which further indicates why *Stubbs* is not applicable to Petitioner's Fifth Amendment claim here.[1] *See Perkins*, 496 U.S. at 296 (holding that Sixth Amendment precedent is not applicable in a case where charges had not been filed.).

D.    Harmless Error

Just because there was a Fifth Amendment violation in Petitioner's criminal case does not necessarily mean he is entitled to federal habeas relief. Respondent argues that any error regarding the admissibility of Petitioner's statements was harmless due to other evidence in Petitioner's case, such as the jailhouse telephone recordings of him discussing the case with his friends and family. [ECF No. 17 at 45-46]. Petitioner, on the other hand, argues that the jailhouse recordings are far less inculpatory and extensive, and that the error was not harmless. [ECF No. 17 at 8].

---

[1] Before proceeding to the implications of the Fifth Amendment violation in Petitioner's criminal case, the Undersigned briefly notes that Petitioner conceded that the Sixth Amendment right to counsel was not implicated by the motion to suppress because it had not attached at that stage of the case. [ECF No. 17 at 4-5]. Thus, the claim should be dismissed.

The harmless error test is set forth by the Supreme Court in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). In *Brecht*, the Court held that the test is whether an error "had a substantial and injurious effect or influence in determining the jury's verdict." *Id*. at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). "Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in "actual prejudice." *Id*. at 637 (citing *United States v. Lane*, 474 U.S. 438, 449 (1986)).

"To show prejudice under *Brecht*, there must be more than a reasonable possibility that the error contributed to the conviction or sentence." *Mason v. Allen*, 605 F.3d 1114, 1123 (11th Cir. 2010) (internal quotation marks and alteration omitted). "Although harmless error review is necessarily fact-specific and must be performed on a case-by-case basis, the erroneous admission of evidence is likely to be harmless under the *Brecht* standard where there is significant corroborating evidence, … or where other evidence of guilt is overwhelming." *Mansfield v. Sec'y, Dep't of Corr.*, 679 F.3d 1301, 1313 (11th Cir. 2012) (citations omitted).

Looking to the facts of Petitioner's case, we know from the record that Petitioner was tried jointly with his co-defendant, and that the trial lasted eight days. [ECF No. 6 at 4]. We also know there were no eyewitness identifications of either

defendant at trial and neither defendant testified. [*Id.*]. Importantly, there was no physical evidence specifically linking Petitioner or his co-defendant to the crimes.

Police recovered nine bullet casings from the scene, as well as the bullets recovered from the victims' bodies, and determined them to have come from a .40 Glock pistol. [*Id.* at 10]. However, no firearm was recovered from the scene, and approximately nine months later, the murder weapon was recovered by the police in the course of investigating an unrelated 2009 crime. [*Id.*]. Obviously, Petitioner and his co-defendant were incarcerated at the time of the unrelated crime and recovery of the firearm, and it is unknown who possessed the murder weapon during that period of time.

The "star witness" against the defendants was Terrance "Bull" Yarborough, a former member of Petitioner's gang. [*Id.* at 6]. However, Yarborough is a four-time convicted felon and only told Detective Solis that Petitioner was the one responsible for the shooting after Yarborough was arrested for an unrelated armed robbery in which faced a potential sentence of life imprisonment if convicted. [*Id.*]. In exchange for his testimony against the defendants, Yarborough only received 5 years' imprisonment. [*Id.*].

In addition to Yarborough's extensive but uncorroborated testimony against the defendants, the prosecution also provided cellular tower records that placed Petitioner's cell phone within approximately two to three miles of a tower near the

shooting at the time the shooting took place. [*Id*. at 7-8]. However, that doesn't have significant probative value because the Annie Coleman Apartments (also known as the "Rockies") where Petitioner and his gang operated were also located within the three-mile area, there were no GPS records showing more specific information on the location of Petitioner's cell phone, nor does it show who actually possessed the cell phone at the time it was within the radius of the tower. [ECF No. 14-5 at 76-77].

The final noteworthy evidence consists of recordings of Petitioner's telephone calls to friends and family while in jail awaiting trial. [ECF No 13-2 at 72-76]. In one telephone call, Petitioner discusses Yarborough "snitching" on Petitioner, and tells an unknown caller that he should tell Yarborough "if they make him go to court, tell him to say that it all was all a lie. He just made it up because I owed him some money." [*Id*. at 72].

In another call, Petitioner discusses the police's search for the murder weapon, saying "they ain't going to find that shit." [*Id*. at 72-74]. In a call with his mother, Petitioner discusses the tracing of his cell phone, and says "[t]here ain't nothing on that phone." [*Id*. at 74]. Later, he discusses "snitching" with his mother, and states that the reason he is in jail is because of Yarborough "snitching on me." [*Id*. at 75-76]. Finally, in another call with an unknown female, Petitioner states that he wants to "see Bernard's ass, so [he] can whoop his ass" and that his co-defendant is a "snitching ass" and a "[p]ussy." [*Id*. at 76]. In that call, Petitioner also says:

"everything was all good until the police snatched Bull's [Yarborough] ass," and that he hates him. [*Id*.].

Respondent argues that the admission of the recording from Petitioner's conversation with his co-defendant from the police station interview room was harmless error because the above jail conversations were similar and unchallenged inculpatory statements. Respondent also highlights that Petitioner's statements to Yarborough, which Yarborough testified to at trial, were highly inculpatory in support of the error being harmless. However, a review of the transcript of Petitioner's conversation in the police station interview room shows that the statements were much more damning, and a review of the trial transcripts shows that they were the most significant evidence against Petitioner outside of Yarborough's obviously self-serving testimony.

Simply put, at trial, the prosecution argued that Petitioner's police station interview room statements essentially amounted to a confession and invited the jury to listen to them "as many times as you want to" during their deliberations, placing Petitioner's counsel in the unenviable position of attempting to explain away the statements without having Petitioner testify at trial. [ECF No. 14-8 at 110-11]. Outside of this, the prosecution relied upon the sworn testimony of a four-time convicted felon who was attempting to avoid a lifetime term of imprisonment for his own armed robbery, cellular tower records indicating that Petitioner's cell phone

was within three miles of the shooting, and Petitioner's far less inculpatory jailhouse telephone call recordings.

Otherwise, there were no eyewitnesses who identified Petitioner as the shooter, no physical evidence connecting Petitioner to the shootings, no evidence connecting Petitioner to the firearm, which was found in someone else's possession months after the shooting, and the vehicle that was allegedly used in the shooting was never recovered and was not linked to Petitioner in any way. In short, Petitioner was convicted on Yarborough's words, relatively weak circumstantial evidence, and the unconstitutionally obtained police station interview room statements. The state court's erroneous admission of the statements was far from harmless, and as a result, the conviction cannot stand.

### IV.   Recommendations

Based on the above, it is **RECOMMENDED** that Petitioner's Amended Petition for Writ of Habeas Corpus [ECF No. 6] be **GRANTED IN PART** as to Petitioner's claim that his Fifth Amendment rights were violated when the state court failed to suppress his interview room statements to his co-defendant, **DENIED** in all other respects, and the case be **CLOSED** by the Clerk of Court.

Objections to this Report and Recommendation may be filed with the District Judge within fourteen days of receipt of a copy of such. Failure to do so will bar a *de novo* determination by the District Judge of anything in the Report and

Recommendation and will bar an attack, on appeal, of the factual findings of the Magistrate Judge. *See* 28 U.S.C. § 636(b)(1)(C); *see also Thomas v. Arn,* 474 U.S. 140, 149 (1985).

    **SIGNED** this 29th day of July, 2020.

_____
UNITED STATES MAGISTRATE JUDGE

cc:    **All Counsel of Record**; and

    **Jimmie L. Bowen**
    B12752
    Madison Correctional Institution
    Inmate Mail/Parcels
    382 SW MCI Way
    Madison, FL 32340